# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25 CR 693 |
| | ) | Judge April M. Perry |
| MICHAEL RABBITT, | ) | |
| KATHERINE MARIE ABUGHAZALEH, | ) | |
| ANDRE MARTIN, and BRIAN STRAW | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR DISCLOSURE OF PROSECUTOR'S
## INSTRUCTIONS OF THE LAW TO THE GRAND JURY

*"It is axiomatic, therefore, that the grand jury must be both 'independent' and 'informed.'"*[1]

Michael Rabbitt, Katherine Marie Abughazaleh, Andre Martin, and Brian Straw, by and through their attorneys, respectfully move this Court for an order requiring the disclosure of the unredacted grand jury transcripts previously produced to the Court (in redacted form) on April 23, 2026 (Dkt. 129), detailing how the Department of Justice instructed the grand jury on the law governing the charges in the indictment returned in this case.

This motion is compelled because, despite its pronouncement in court that it would dismiss the conspiracy count charged in Count One of the indictment[2], thereby rendering moot a number of issues raised by the defense, the government has now informed defense counsel that it intends to keep the Sec. 372 conspiracy charge alive and pending until after trial and final resolution of the

---

[1] *United States v. Flomenhoft*, 714 F.2d 708, 711 (7th Cir 1983).

[2] Dkt. 142, at 3:25-4:9.

1

misdemeanor counts alleged in the superseding information—charges that are nearly identical as those in the indictment. The defense will separately seek an order of dismissal with prejudice of Count One.

Moreover, given the government's constantly shifting theories regarding the conspiracy charged in Count One and the Court's order requiring production of the unredacted grand jury transcripts and, perhaps more importantly, the instructions of the law and documents shown to the grand jury regarding the law, the government's tactic of bringing a superseding information but *not* immediately dismissing the indictment appears to evade the Court's order and withhold the grand jury transcripts that the defense and, in many respects, the public at large have a compelling interest to see.

Indeed, if the grand jury was mis-instructed or not instructed at all on the law, then the current indictment must be dismissed. What has instead transpired is that when faced with a potential Court order for production of grand jury materials, which would reveal the deficiencies therein, the government shielded disclosure of those materials. The defense accordingly seeks disclosure of the grand jury transcripts and materials for the reasons set forth below.

**Factual Background**

**A.      Broadview Protest**

On September 26, 2025, Mr. Michael Rabbitt, Ms. Katherine Abughazaleh, Mr. Andre Martin, Ms. Catherine Sharp, Mr. Brian Straw, and Ms. Joselyn Walsh traveled to the Broadview Detention Center to protest the now well-documented atrocities that were being committed by ICE Agents across the Chicagoland area and elsewhere.[3]

---

[3] *See, e.g.*, Illinois Accountability Comm'n, Final Report (April 2026) (finding that federal agents engaged in extreme physical force, routinely lied to the public and created an environment of occupation that

Around 7:45 a.m. a Black SUV driven by an ICE Agent, Agent A, drove into a crosswalk full of protestors causing panic and confusion. After making contact with the protestors, Agent A did not stop his vehicle to allow for individuals to move out of its path.  Eventually Agent A made it through the crowd and drove into the Broadview Detention Center where he appears to have spent much of the day <u>proudly texting</u> other individuals about driving through protestors—who he described as "trash"—and joining riot control—which he said "was fun."

### B.      Indictment

One month later, on October 23, 2025, the U.S. Attorney's Office for the Northern District of Illinois obtained an indictment charging the above-named individuals with a felony offense alleging that they conspired with each other and others to prevent by force, intimidation, and threat Agent A from discharging his duties, and to injure him in his person or property, in violation of 18 U.S.C. §372. (Dkt. 1).  The indictment also contained a corresponding misdemeanor count for each individual charging them with forcibly impeding, interfering, and intimidating Agent A.

None of the six individuals had any criminal history, and the government has conceded that none of them caused any damage to Agent A's vehicle. Despite those facts, the U.S. Attorney's Office chose to devote its limited resources to this case and turn it into a public spectacle—targeting six individuals, two now dismissed with prejudice, each with ties to political activity or publicly outspoken against the unlawfulness of ICE's actions. The Office amplified that spectacle by issuing

---

terrorized immigrants and attempted to silence individuals engaged in First Amendment protected activity, documenting numerous instances of illegal conduct by federal law enforcement agents as part of Operation Midway Blitz), available at https://ilac.illinois.gov/content/dam/soi/en/web/ilac/documents/final-report/IAC-Final-Report-April-30-2026.pdf.

a press release announcing the indictment and emphasizing that "[t]he indictment includes a conspiracy charge against all of the defendants arising out of the incident."[4]

Based on undersigned counsel's research, it appears that never in its more than 150-year history has the U.S. Attorney's Office for the Northern District of Illinois brought a charge under 18 U.S.C. §372. And it did not enter these uncharted waters quietly. By deploying this arcane conspiracy statute against protestors during a period of heightened tension in Chicago—when images of ICE's alarming actions were circulating widely across phones and televisions throughout the District—the Office sent an unmistakable message: those who choose to protest are being watched and will be charged with serious felony offenses.

The press release—which went to both local and national media—included quotes about the importance of this case from then Deputy Assistant Attorney General Todd Blanche, now Acting Attorney General, and sent the message that the government would be monitoring protest activity in the community and might well seek indictments of others based on the tenuous grounds detailed in the original indictment here.

### C.     First Dismissals, Refashion and Transcript Request

On March 12, 2026, the government moved to dismiss the indictment against prior defendants Sharp and Walsh with prejudice, which the Court promptly granted. (Dkt. 91, 92). As the case progressed, the government's theory of the conspiracy charge seemed malleable at best. After defense counsel sought clarity on its novel legal theory, the government filed a "notice of intent to

---

[4] The press release is still posted on the U.S. Attorney's Office webpage with no notification of the superseding information being filed without the felony conspiracy count included. In a prior case in which the government dismissed the indictment, the U.S. Attorney's Office put a notice on the press release that the indictment was later dismissed with prejudice by the Office. *See United States v. Marimar Martinez*, 25 CR 636. We respectfully request this Court to order the government to remove the press release from its website immediately or put a banner notice similar to what was issued in the Martinez case.

narrow the conspiracy charge." (Dkt. 96). In a remarkable change of course, in response to Defendants' motion for a bill of particulars, the government informed the Court and the parties that although it initially obtained an indictment charging three separate clauses of 18 U.S.C. §372, and thus *presumably* instructed the grand jury that they must find probable cause for each clause, it was now only proceeding on the first clause of the conspiracy count and that it was further dropping the "threat" portion of that clause that it initially charged. *Id.* Based in part on this material deviation from the conspiracy charge returned by the grand jury, defense counsel sought disclosure of the grand jury transcripts to see how the government instructed the grand jurors on the law regarding the conspiracy count.[5] (Dkt. 118). After the filing of defense counsel's motion and pursuant to the Court's Order, the government finally produced the grand jury transcripts to the Court for *in camera* review of the portions detailing how it instructed the grand jury on the law and required elements for an 18 U.S.C. §372.

Based on this Court's follow-up order, it appears that despite these presumably routine transcripts containing a basic explanation of the law and required elements for the grand jury to be properly informed on the law and to accurately know exactly they were voting on, the government still redacted portions of the "colloquy" between the Department of Justice lawyer and the grand jury from the version provided to the Court. (Dkt. 130). Redacting portions of a transcript only

---

[5] Defense counsel had been seeking the relevant grand jury transcripts of the instructions on the law to the grand jury since the beginning of this case based on the government's novel charging theory in this case and the far-fetched nature of a "spontaneous conspiracy" they somehow convinced a grand jury to go along with. On April 20, 2026, more than *four months* after the defense originally requested the transcripts of how the AUSAs instructed the grand jury on the law in this matter, the government filed a motion seeking more time to produce the transcripts "to obtain all relevant transcripts." (Dkt. 121). This indicates that despite these repeated requests the government never even checked to see how they actually instructed the grand jury on the law in a case they were using a statute for the first time in this District.

being viewed by a federal judge *in camera* and *ex parte* raises numerous red flags, especially after months of the government fighting the disclosure of the transcripts at all.

Indeed, after reviewing only the portions of the redacted transcripts the government allowed this Court to see, the Court set an in-person hearing, ordering the government "to bring to the hearing fully un-redacted versions of the transcripts it has filed under seal (which currently contain redactions within the colloquy portions) as well as a copy of any presentation(s) or document(s) shown to the grand jurors summarizing the law." (Dkt. 130).

### D. "Dismissal" of Conspiracy Count

The Court's subsequent directive to the government to bring it an unredacted "copy of any presentation(s) or document(s) shown to the grand jurors summarizing the law" suggests the redacted version the government had provided was missing certain material information or other matters of substantive concern. That raises an obvious question: if such a summary existed, why would the government withhold it, instead of producing it to the Court along with the transcripts?

This was no oversight as the government had ample time to consider its response and made a considered decision to withhold portions of the presentation—even from *in camera*, *ex parte* review by the Court. At the April 29 hearing, when the Court asked the government whether it would object to producing to the Defense the unredacted transcript and the exhibits presented to the grand jury, the government chose a more telling course. After six months of hard-fought, highly public litigation, including just-filed briefing on substantive and highly contested motions *in limine—and less than a month before trial*—it abruptly announced its decision to dismiss the indictment in order to "moot" the production of the grand jury materials, offering no explanation to the Court, the parties,

or the public. The decision to abandon the case's central and most serious allegation at this late stage speaks volumes.

Specifically, the following colloquy took place between the Court and the lead AUSA regarding this decision in court on April 29, 2026:

> **The Court:** In terms of the grand jury transcripts, let me start by asking the government. Do you object to those being provided to the defendants?
>
> **MR. HOGAN**: Your Honor, I think that we're going to find that that issue is moot. We're going to move to dismiss Count 1, and we are filing, as we speak, a superseding information on the remaining counts with the remaining four defendants.
>
> **THE COURT**: Okay.
>
> **MR. HOGAN**: So we have brought you, in compliance with your order, the unredacted versions; but since we are moving to dismiss Count 1 and their motion and your order were directed to that, I think that that issue should be moot.

Dkt. 142, at 3:25-4:9

This remarkable about-face, abandoning a high-profile indictment rather than submit to scrutiny its conduct before the grand jury comes at a time of mounting national distrust in the Department of Justice's use of the grand jury process. The timing is likely no coincidence. In just the past few weeks, the government has secured indictments against a former FBI Director based on an Instagram photograph of seashells on a beach, and against a notable civil rights organization. These actions only underscore the growing concern that the grand jury is being wielded not as an instrument of justice, but as a tool of unchecked prosecutorial power meant to persecute any perceived enemies of the current White House. *See United States v. Calandra*, 414 U.S. 338, 343 (1974) (describing historic function of grand jury to include determining if probable cause exists and to protect "citizens against unfounded criminal prosecutions").

Indeed, in the above-mentioned Southern Poverty Law Center case, according to a recent whistleblower report, a senior Trump administration Justice Department official ordered federal prosecutors in Alabama to "rush through" the controversial indictment despite serious concerns about the strength of the case.[6] This has prompted counsel in that case to make the same demands for visibility into how this Department of Justice is instructing the country's grand jurors on the law surrounding these suspect indictments which we have never before seen in this country.

While historically courts have afforded the Department of Justice a presumption of regularity, that presumption has been thoroughly eroded over the past 15 months and no longer holds. As one court recently described, while "[g]enerations of presidential administrations and public officials have validated this underlying premise of the presumption of regularity," "[i]n just six months, the President of the United States may have forfeited the right to such a presumption" entirely. *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90–92 (D.D.C. 2025), appeal docketed, No. 25-5303 (D.C. Cir. Aug. 20, 2025); *see United States v. Oregon*, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [the government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

Courts have specifically focused on how the Department of Justice has been misusing grand juries and again questioned the historic presumption of regularity. *See, e.g., United States v. Comey*, 809 F. Supp. 3d 396, 410 (E.D. Va. 2025) ("[T]his unusual series of events, still not fully explained by the prosecutor's declaration, calls into question the presumption of regularity generally associated with grand jury proceedings, and provides another genuine issue the defense may raise to challenge

---

[6] https://s3.documentcloud.org/documents/28088572/congressman-accuses-justice-department-of-rushing-splc-indictment.pdf

the manner in which the government obtained the indictment.") (emphasis added); *United States v. Stewart*, 2025 WL 16 2754480, at \*1 (D.D.C. Sept. 29, 2025) (describing federal prosecutors' conduct as "[a]t a minimum, . . . unseemly; more than likely it is unlawful. Not to mention, this only deepens the growing mistrust of the actions of prosecutors. That is a sentiment that was once unthinkable, but *the irregular is now the regular*.") (emphasis added).

### E. Potential Scenarios with The Grand Jury Presentation in This Case.

It bears emphasizing that the request for the grand jury transcripts by defense counsel did not seek factual testimony but was narrowly tailored to the government's *legal instructions* on the novel conspiracy charge at issue here. There are, realistically only three plausible explanations for what the grand jury transcripts contain—each troubling in its own right—that would lead the government to endure yet another public black eye by unceremoniously announcing its intent to dismiss the felony conspiracy count less than a month before trial:

1. The AUSA *mis-instructed* the grand jury on the law.

2. The AUSAs *failed to instruct* the grand jury on the law at all.

3. There are interactions between the AUSA and the grand jury which are otherwise improper or prejudicial.

For the below reasons, under any of these three scenarios, justice requires disclosure.

### I. Argument

#### A. The Grand Jury Transcripts Should Be Disclosed Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii).

Federal Rule of Criminal Procedure (FRCrP) 6(e)(3)(E)(ii) allows for the court to order disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Here, despite

telling the Court that this issue was moot because "we are moving to dismiss Count 1" (Dkt. 142, at 4:7-8), the government has refused to actually dismiss the indictment at this time, and thus this Court retains the power to order the disclosure of these transcripts and documents shown to the grand jury pursuant to the text of FRCrP 6(e)(3)(E)(ii).[7] That rule recognizes that courts have the authority to "dismiss an indictment because of misconduct before the grand jury." *United States v. Williams*, 504 U.S. 36, 46 (1992) *(citing Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988))—authority that cannot be exercised unless defense counsel can obtain grand jury materials and inform the Court about the misconduct.

Importantly, the defense has a strong interest in having this Court make the decision to dismiss the still pending indictment, with prejudice, and each of the three potential scenarios above would warrant dismissal.[8] *First*, if the Government mis-instructed the grand jury—even if unintentional—the defense (and general public) should know whether this prosecution, which impacted elections and potentially suppressed public dissent, was built on a fundamental legal error in the constitutionally-mandated grand jury process. *Second*, whether by design or neglect, a failure to provide legal instruction to grand jurors would amount to a wholesale abdication of one of the fundamental roles of a prosecutor seeking return of an indictment from a grand jury, and a clear violation of U.S. Attorney rules and regulations. *See* United States Attorneys Manual § 9-11.000

---

[7] Initially when undersigned counsel reached out to the lead prosecutor about when the government would be dismissing the indictment, government counsel told defense counsel that there would be a corresponding motion to dismiss the indictment "now that the information has been docketed." Yet, when no motion to dismiss was filed after the information was docketed, the government responded to a follow-up inquiry the next day by stating, "[a]s is usual, we will move to dismiss the superseded indictment *after* the proceedings on the now-operative Information are concluded." This new position is not consistent with what this same prosecutor told the Court on April 29 (Dkt. 142, at 4:7-8).

[8] Based upon the government's representations regarding dismissal of the conspiracy allegation, the defense is also today moving to dismiss the indictment.

(noting "[t]he prosecutor's responsibility is to advise the grand jury on the law and to present evidence for its consideration.") In a case involving the first use of this statute in the history of this District, such a failure would raise serious concerns about the validity and viability of the indictment, including because it would have improperly left the grand jurors unaware and uninformed of what the law required for them to find probable cause. *Third*, if the relevant grand jury minutes contain interactions between the AUSA and the grand jury that is otherwise improper or affects the validity of the indictment or the grand jury process, that too should be disclosed. The fact that portions of the government's colloquy with the grand jury was withheld from this Court for its *in camera, ex parte* review after six months of aggressive litigation, itself, raises serious concerns.

Based on the events described above, it is certainly likely that the transcripts contain information that will empower the defense to make such a motion to dismiss, or seek other relief, based on one or more of these grounds. While the defense is required to demonstrate a "particularized need" for the transcripts that outweighs the interest in maintaining grand jury secrecy, that standard is easily met here as there seems to be no reasonable explanation the government can offer for its filing of the superseding information and vow to dismiss the conspiracy charge other than to avoid disclosure of what is contained in the grand jury transcripts. *See, e.g., United States v. Naegele*, 474 F. Supp. 2d 9, 13, 2 (D.C. Dist. 2007) (authorizing disclosure of grand jury materials). In these circumstances, **there is virtually no interest in maintaining secrecy in how the government instructed a now dismissed grand jury on the law for an indictment it has already told the Court it would dismiss, but has not actually done so**. *See In re Grand Jury Proceedings Relative to Perl*, 838 F.2d 304, 305 (8th Cir. 1988) ("the interests in grand jury secrecy are reduced, although

not eliminated, when the grand jury has ended its investigation. After the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it.").

Accordingly, the defense has a compelling interest in obtaining the materials that the Court previously ordered the government to prepare. Based on the record and the Court's inquiry, there is a risk that the grand jury was mis-instructed on the law during the government's presentation, which subjects the indictment to dismissal. *See United States v. Stevens*, 771 F. Supp. 2d 556, 566-67 (D. Md. 2011) (*citing United States v. Peralta,* 763 F. Supp. 14, 21 (S.D.N.Y. 1991)) ("where a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantial influence' of the erroneous instruction.").

Thus, the defense asks this Court to order the immediate disclosure of the unredacted grand jury transcripts and other materials the Court previously required the government to provide it, in order to shed light on which of the three above-described scenarios took place before the grand jury in this matter, and what must be done to remedy any such defects.

**B.     The Prosecutors' Legal Instructions Are Not Covered by Rule 6(e)'s Secrecy Requirement.**

Unlike the substance of grand jury proceedings, a prosecutor's introductory remarks and legal instructions provided to the grand jury are not presumptively covered by Rule 6(e)'s secrecy requirement and "does not require a particularized need." *United States v. Woody's Trucking, LLC,* 2018 WL 457781, at *1 (D. Mont. Jan 17, 2018) (*citing United States v. Alter,* 482 F.2d 1016, 1029 n.21 (9th Cir. 1973)).

Indeed, commentators have noted that grand jury secrecy "does not govern matters such as a court's charge to a grand jury." Susan Brenner & Lori Shaw, Federal Grand 17 Jury: A Guide to

Law and Practice § 16:11 (2d ed. updated through Sept. 2025). "The legal instructions given to the grand jury regarding the charges on which they are deliberating are a part of the 'ground rules' by which the grand jury conducts its proceedings. The instructions do not reveal the substance of the grand jury's deliberative process or other information that would compromise the secrecy that Rule 6 seeks to protect." *United States v. Belton*, 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015). *See also In re Cudahy*, 294 F.3d 947, 951 (7th Cir. 2002) (Posner, J.) ("[M]inisterial grand jury records, such as records reflecting the empaneling and extension of the grand jury, are not within the reach of Rule 6(e) because they reveal nothing of substance about the grand jury's investigation.") (quoting 1 Sara Beale et al., Grand Jury Law and Practice § 5:6 (2d ed. 2001)). Rule 6(e) applies to the substance of jury deliberations, the identity of grand jurors or expected witnesses, or evidence that is actually presented to the jury—not the basic ground rules by which the grand jury conducts its proceedings. *See United States v. Rosen*, 471 F. Supp. 2d 651, 655 (E.D. Va. 2007). Accordingly, the Court should order their disclosure to Defendants in this case.

**C.  The Court Has Inherent Authority Regarding the Disclosure of Grand Jury Transcripts.**

Seventh Circuit authority is clear that Rule 6 does not eliminate the "inherent supervisory authority the district courts have historically wielded over the administration of a grand jury." *Carlson v. United States*, 837 F.3d 753, 763 (7th Cir. 2016). Indeed, the Court may order disclosure in any situation "where there is some extraordinary and compelling need for disclosure in the interest of justice, and little traditional need for secrecy remains." *Id.* at 766. And the Supreme Court has made clear that "'disclosure' of grand jury materials is 'committed to the discretion of the trial court.'" *Id.* at 763 (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959)).

This case has garnered significant public scrutiny and comes at a time in our nation's history where numerous questionable indictments have been secured through the grand jury process. While it is unclear to defendants what is contained in the to-date withheld grand jury minutes, this is a case where the interests of justice clearly outweigh any need for secrecy and that this Court should use its "supervisory authority to safeguard the integrity of the grand jury process." *Comey*, 809 F. Supp. 3d at 411 (quotation marks omitted).

## II.       Conclusion

For the foregoing reasons, Brian Straw respectfully request that the Court grant this motion and order the government to disclose the unredacted grand jury transcripts previously provided to the Court in redacted format, including all instructions, documents, and exhibits shown to the grand jury, as previously ordered by the Court.

Respectfully submitted,

**/s/ Nancy L. DePodesta**
**/s/ Carly Alana Chocron**
Taft Stettinius & Hollister LLP
111 E Wacker Dr, Suite 2600
Chicago, IL 60601
312-836-5884
ndepodesta@taftlaw.com
cchocron@taftlaw.com
*Attorneys for Michael Rabbitt*

**/s/ Joshua G. Herman**
Law Office of Joshua G. Herman
53 W. Jackson, Blvd., Suite 404

Chicago, IL 60604

312-909-0434

jherman@joshhermanlaw.com

**/s/ Molly Armour**
Law Office of Molly Armour
53 W. Jackson Boulevard,
Suite 1424 Chicago, IL 60604
773-746-4849
armourdefender@gmail.com
*Attorneys for Katherine Marie Abughazaleh*

**/s/ Theodore Thomas Poulos**
**/s/ Terence H. Campbell**
**/s/ Valerie Ann Davenport**
Cotsirilos, Poulos &
Campbell, Ltd.
55 E. Monroe Street, Suite
3250
Chicago, IL 60603
312-263-0345
tpoulos@cotsiriloslaw.com
tcampbell@cotsiriloslaw.com
vdavenport@cotsiriloslaw.com
*Attorneys for Andre Martin*

**/s/ Christopher Parente**
**/s/ Damon M Cheronis**
Cheronis & Parente
140 S. Dearborn, Suite 404
Chicago, IL 60603
773-458-4899
cparente@cheronislaw.com
damon@cheronislaw.com
*Attorneys for Brian Straw*