# Exhibit A

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **No. 3:25-cr-00115** |
| | ) |
| **KILMAR ARMANDO ABREGO** | ) |
| **GARCIA,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM OPINION

Then-Attorney General Robert H. Jackson warned his fellow prosecutors long ago of the danger of picking the person first and the crime second. "Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." Robert H. Jackson, The Federal Prosecutor, 31 J. Crim. L. & Criminology 3, 5 (1940). That is the situation here.

Kilmar Armando Abrego Garcia ("Abrego") moves to dismiss the indictment for vindictive and selective prosecution in violation of the Fifth Amendment's Due Process Clause. (Doc. No. 104). His motion arises from the Executive Branch's response to his lawsuit challenging his wrongful removal from the United States to El Salvador. His lawsuit resulted in the Judicial Branch unanimously directing the Executive Branch to "facilitate" Abrego's return. Abrego Garcia v. Noem, No. 8:25-cv-00951, 2025 WL 1024654, at *1 (D. Md. Apr. 4), amended, 2025 WL 1085601 (D. Md. Apr. 10, 2025); Abrego Garcia v. Noem, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025); Noem v. Abrego Garcia, 145 S. Ct. 1017, 1018 (2025). Within days of the Supreme Court's ruling, the Department of Homeland Security ("DHS") reopened its closed

investigation of a November 30, 2022 traffic stop of Abrego in the Middle District of Tennessee. (Doc. No. 138 at 5). Less than thirty days after that, the Department of Justice ("DOJ," or "Main Justice") charged Abrego and finally returned him to the United States to answer a two-count indictment. That indictment charges Abrego with conspiring to transport aliens between 2016 and 2025 and with transporting undocumented aliens during the November 2022 traffic stop. (Doc. No. 3 at 3–9).

The Court previously found that Abrego made a *prima facie* showing of some evidence of a realistic likelihood of vindictiveness. (Doc. No. 138 at 9). That threshold showing shifted the burden to the Government to rebut the resulting presumption of vindictiveness. (Id.). To afford the Government that opportunity, the Court conducted an evidentiary hearing on February 26, 2026. The Government presented two witnesses: former Homeland Security Investigation – Nashville ("HSI-Nashville") Special Agent in Charge Rana Saoud, and former Acting U.S. Attorney for the Middle District of Tennessee Robert McGuire. The Court has considered their testimony, to the extent that it is credible, and the exhibits admitted into evidence. After the evidentiary hearing, the parties submitted posthearing briefs. (Doc. Nos. 306, 307). Abrego's motion is ripe for decision.

## I.      FINDINGS OF FACT

The Court draws its factual findings from the complete record in this case and from related litigation. This includes the transcripts and exhibits from four hearings: the detention hearing on June 13, 2025; the release hearing on June 25, 2025; the evidentiary hearing on the Government's motion for revocation of the release order on July 16, 2025; and the evidentiary hearing on Abrego's motion to dismiss on February 26, 2026. The Court has also considered filings on pretrial motions, together with exhibits, as well as Abrego Garcia v. Noem, No. 8:25-cv-00951 (D. Md.), the appellate decisions by the Court of Appeals for the Fourth Circuit and the Supreme Court, and

United States v. Hernandez-Reyes, No. 4:23-cr-00321 (S.D. Tex.). The Court further takes judicial notice of the publicly issued statements and press releases referenced below.[1]

Being mindful that "[e]ach situation of this sort will necessarily turn on its own facts," United States v. Adams, 870 F.2d 1140, 1146 (6th Cir. 1989) (citing United States v. Andrews, 633 F.2d 449, 454 (6th Cir. 1980) (en banc)), the Court finds the facts set forth in the timeline below to be true, accurate, and credible.[2]

### UNITED STATES V. ABREGO GARCIA - FACTUAL FINDINGS AND TIMELINE OF EVENTS

| Date | Event | Citation |
|---|---|---|
| Tuesday November 30, 2022 | Tennessee Highway Patrol ("THP") performs a traffic stop for speeding on a vehicle driven by Abrego. THP referred information about the traffic stop to the Federal Bureau of Investigation and Homeland Security Investigations – Baltimore ("HSI-Baltimore"). THP confirmed that the vehicle was registered to Jose Ramon Hernandez-Reyes ("Hernandez-Reyes") in Texas, who was previously convicted of aiding and abetting the illegal transportation of aliens in 2019. | Revocation Hr'g Tr. at 13, 26–27; Gov't Revocation Hr'g Ex. 6; Gov't Revocation Hr'g Ex. 7. |
| Thursday December 22, 2022 | HSI-Baltimore opens an investigation on Abrego, which is approved by Supervisory Special Agent Heather Woodson. | Def. Evid. Hr'g Ex. 30 at 5. |

---

[1] The Court may take judicial notice of facts "not subject to reasonable dispute" because they can "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

[2] The Court cites to the transcript of the evidentiary hearing on the Government's motion for revocation of the release order, on July 16, 2025 (Doc. No. 99), as "Revocation Hr'g Tr." The transcript of the evidentiary hearing on Abrego's motion to dismiss, on February 26, 2026 (Doc. No. 300), is cited as "Evid. Hr'g Tr." Exhibits are cited by the party that offered them and the hearing at which they were admitted. For example, "Gov't Revocation Hr'g Ex. ___" and "Def. Evid. Hr'g Ex. ___."

3

| Date | Event | Citation |
|------|-------|----------|
| Wednesday February 5, 2025 | Then-Attorney General Pamela Bondi issues a memorandum to all Department of Justice ("DOJ") employees, including attorneys. It states that any DOJ attorney who, "because of their personal political views or judgments declines to sign a brief or appear in court, refuses to advance good-faith arguments on behalf of the Administration, or otherwise delays or impedes the Department's mission will be subject to discipline and potentially termination, consistent with applicable law." The Deputy Attorney General at the time is Todd Blanche. Aakash Singh is an Associate Deputy Attorney General in the Office of the Deputy Attorney General ("ODAG") who reports to Blanche. | Evid. Hr'g Tr. at 97–102; Def. Evid. Hr'g Ex. 66. |
| Wednesday March 12, 2025 | HSI-Baltimore arrests Abrego in Maryland. Supervisory Special Agent John VanWie signs the Report of Investigation ("ROI") drafted by Special Agent Francis McGarvey, Jr. | Doc. No. 155-2. |
| Saturday March 15, 2025 | The Executive Branch removes Abrego from the United States to El Salvador because of an "administrative error." | Abrego Garcia, 145 S. Ct. at 1018. |
| Monday March 24, 2025 | Abrego challenges his removal in the United States District Court for the District of Maryland, Honorable Paula Xinis, presiding. | Abrego Garcia, No. 8:25-cv-00951 (D. Md. filed Mar. 24, 2025). |
| Tuesday April 1, 2025 | HSI-Baltimore closes the investigation on Abrego because he has been removed from the United States. The ROI states: "Investigators have accomplished all goals for this case, and no further investigative efforts will be attributed to the investigation." The ROI is reported by Agent McGarvey and approved by Agent VanWie. | Doc. No. 153. |
| Friday April 4, 2025 | The District of Maryland orders the Executive Branch to "facilitate" Abrego's return to the United States. | Abrego Garcia, 2025 WL 1024654, at *1. |

| Date | Event | Citation |
|---|---|---|
| Monday<br>April 7, 2025 | The United States Court of Appeals for the Fourth Circuit denies the motion for a stay of the District of Maryland's April 4, 2025 order. | Abrego Garcia, 2025 WL 1021113, at *1. |
| Thursday<br>April 10, 2025 | The United States Supreme Court affirms, in part, the District of Maryland's order holding that the order "properly requires" the Executive Branch to "facilitate" Abrego's return.  The Court remands to the district court for clarification of the use of the term "effectuate." | Abrego Garcia, 145 S. Ct. at 1018. |
|  | The District of Maryland clarifies its order "to DIRECT that the Executive Branch take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible." | Abrego Garcia, 2025 WL 1085601, at *1. |
| Friday<br>April 11, 2025 | The District of Maryland finds that the Executive Branch has "made no meaningful effort to comply" with its order to facilitate Abrego's return and requires a daily report on the Executive Branch's efforts to return Abrego. | Abrego Garcia, No. 8:25-cv-00951 (D. Md. filed Apr. 11, 2025) (Doc. No. 61 at 1–2). |
| Tuesday<br>April 15, 2025 | The Government files a status report consisting of the Declaration of the Acting General Counsel for DHS. The declaration states that "Abrego Garcia is being held in the sovereign, domestic custody of the independent nation of El Salvador.  DHS does not have authority to forcibly extract an alien from the domestic custody of a foreign sovereign nation." | Abrego Garcia, No. 8:25-cv-00951 (D. Md. filed Apr. 15, 2025) (Doc. No. 77 ¶ 7). |
| Wednesday<br>April 16, 2025 | The Government appeals the District of Maryland's April 10, 2025 order that "Defendants take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible." | Abrego Garcia, No. 8:25-cv-00951 (D. Md. 2025), appeal docketed, No. 25-1404 (4th Cir. Apr. 16, 2025). |
| Thursday<br>April 17, 2025 | The United States Court of Appeals for the Fourth Circuit denies the motion for a stay of the District of Maryland's April 10, 2025 order. | Abrego Garcia v. Noem, No. 25-1404, 2025 WL 1135112, at *3 (4th Cir. Apr. 17, 2025). |

5

| Date | Event | Citation |
|---|---|---|
| | HSI-Baltimore reopens its investigation into Abrego. Agent VanWie approves the reopening in a document titled "MS-13 Human Trafficking/Smuggling PG County." | Evid. Hr'g Tr. at 114–16; Def. Evid. Hr'g Ex. 30 at 5. |
| Friday April 18, 2025 | DHS issues a press release on Abrego's November 2022 traffic stop with a picture of him in the car that day with another passenger.[3] | See infra note 3; Gov't Revocation Hr'g Ex. 1 at (1:14). |
| Monday April 21, 2025 | The Tennessee Star publishes an article on Abrego's November 2022 traffic stop with a picture of him in the car that day with another passenger.[4] | See infra note 4; Gov't Revocation Hr'g Ex. 1 at (1:14). |
| On or about Monday April 21, 2025 | Agent Saoud learns about Abrego's November 2022 traffic stop for the first time from the April 21, 2025, Tennessee Star article. She contacts her staff and THP. | Evid. Hr'g Tr. at 12–15, 24. |
| Tuesday April 22, 2025 | Homeland Security Investigation – Birmingham ("HSI-Birmingham") interviews Hernandez-Reyes regarding Abrego's human smuggling activities at HSI-Baltimore's request. | Def. Revocation Hr'g Ex. 1. |
| Thursday April 24, 2025 | HSI-Birmingham again interviews Hernandez-Reyes, with his legal counsel present, at HSI-Baltimore's request. The U.S. Attorney's Office for the Southern District of Texas provides Hernandez-Reyes a proffer letter, which he accepts. Agent McGarvey is present. | Def. Revocation Hr'g Ex. 2. |

---

[3] DHS Releases Bombshell Investigative Report on Kilmar Abrego Garcia Suspected Human Trafficking Incident, Dep't of Homeland Sec. (Apr. 18, 2025), https://www.dhs.gov/news/2025/04/18/dhs-releases-bombshell-investigative-report-kilmar-abrego-garcia-suspected-human [https://perma.cc/U7F8-2SXD].

[4] Tom Pappert, 2022 TN Traffic Stop of Kilmar Abrego Garcia Was Day Three of Trip That Originated in Houston, Took Detour to St. Louis, Crossed Trafficking Hubs and Areas with MS13, Tenn. Star (Apr. 21, 2025), https://tennesseestar.com/justice/2022-tn-traffic-stop-of-kilmar-abrego-garcia-was-day-three-of-trip-that-originated-in-houston-took-detour-to-st-louis-crossed-trafficking-hubs-and-areas-with-ms-13/tpappert/2025/04/21/ [https://perma.cc/6ZJG-Z7L6].

6

| Date | Event | Citation |
|------|-------|----------|
| Sunday April 27, 2025 | Agent Saoud calls McGuire to tell him about Abrego's November 2022 traffic stop. Agent Saoud assigns Peter Joseph as the case agent. | Evid. Hr'g Tr. at 14–16, 24. |
| | Singh sends McGuire an email requesting "time tomorrow morning to discuss" Hernandez-Reyes. Singh's email includes the U.S. Attorney for the Southern District of Texas, Nicholas Ganjei, and the interim U.S. Attorney for the Northern District of Alabama, Prim Escalona. | Evid. Hr'g Tr. at 55–56; Gov't Evid. Hr'g Ex. 1 at 3.[5] |
| Monday April 28, 2025 | At 12:53 a.m. William Walker, Acting Assistant Director of Domestic Operations for HSI, emails the THP report on November 2022 traffic stop directly to Singh. McGuire is not copied on the email. | Gov't Evid. Hr'g Ex. 1 at 2927. |
| | Singh, McGuire, and other U.S. Attorneys have a call to discuss logistics for Hernandez-Reyes. | Evid. Hr'g Tr. at 56. |
| | Joint Task Force Vulcan ("JTFV")—a DOJ task force that primarily deals with gang-related and transnational-related offenses—agrees to assist McGuire. | Evid. Hr'g Tr. at 59; Doc. No. 121-1 ¶ 5. |
| Tuesday April 29, 2025 | McGuire starts drafting a criminal complaint against Abrego. | Evid. Hr'g Tr. at 82–83. |
| | HSI-Birmingham interviews Hernandez-Reyes, with his legal counsel present, for a third time at HSI-Baltimore's request. Hernandez-Reyes continues to discuss Abrego's human smuggling activities. He also signs a Consent to Search form allowing HSI to search his iPhone 15. | Def. Revocation Hr'g Ex. 3. |
| Wednesday April 30, 2025 | Co-Director of JTFV Jacob Warren sends an attachment "Re: Hernandez-Reyes" to Singh, Escalona, Ganjei, McGuire, and Kendra Wharton (Associate Deputy Attorney General). | Gov't Evid. Hr'g Ex. 1 at 3. |
| | McGuire writes: "Based on the conversations Jake and I are having, I think it is reasonable to believe we could have a charging document next week. We | |

---

[5] Gov't Evid. Hr'g Ex. 1 consists of multiple pages of unnumbered email correspondence. The Court cites to that exhibit using the numeric portion of the corresponding bates-stamped page number, omitting leading zeros.

7

| Date | Event | Citation |
|---|---|---|
| | are hammering as hard as we can on this effort." <br><br> Singh writes: "Awesome news thank you guys. Keep me posted. Let me know what I can do to help." | |
| | McGuire emails Singh "Re: Tennessee Traffic Stop" to inform him that the Tennessee Department of Safety is releasing a redacted video from the November 2022 traffic stop. <br><br> Singh asks detailed questions about why and how the release would proceed. <br><br> Singh later emails McGuire and Warren to ask: "How close do we think we are to charging? And can we set up a brief call before charges get filed?" <br><br> McGuire responds: <br><br> > I think towards the end of next week. . . . <br><br> > My vision was that I would talk with you and Jake about complaint vs. indictment and pass the charging documents up the chain of command before swearing them out. . . . <br><br> > We're all hammering as hard as we can go on the work that we need to do to get this case tight and right. I think with some luck we should be able to . . . by next Wednesday/Thursday. <br><br> > Definitely planned on a call before going ahead – we want the high command looped in. Happy to talk at any time. This is highest priority for me right now. <br><br> Singh responds: "Thank you Rob I appreciate that. Do we have a sense of potential charges?" <br><br> McGuire responds: "We could also do a speaking indictment. . . . That said, we are continuing to | Gov't Evid. Hr'g Ex. 1 at 7–9. |

8

| Date | Event | Citation |
|---|---|---|
| | investigate and will continue to investigate this activity." Singh responds: "Thanks for the detailed readout and consistent updates. I appreciate you and Jake and your teams pushing on this. It's a top priority for us. Can we sketch out a draft complaint . . . by 5pm tomorrow? Let's hop on a call tomorrow morning if possible even if just for 5-10 min." | |
| Thursday May 1, 2025 | McGuire sends Singh a draft complaint affidavit reviewed by Warren. Singh asks McGuire if "we have the Baltimore/Maryland report where [Abrego] was arrested with MS-13?" McGuire replies: "I don't have it. I have never had it. But I can ask Baltimore HSI for it." Singh responds: "Thanks Rob I'll call you shortly." | Gov't Evid. Hr'g Ex. 1 at 10. |
| | Warren sends Singh and McGuire "what our intel chief pulled from open source" in an email titled "Fw: Documents for review." Singh responds: "Thanks so much Jake." | Gov't Evid. Hr'g Ex. 1 at 12. |
| Friday May 2, 2025 | HSI-Nashville officially opens an investigation on Abrego. | Evid. Hr'g Tr. at 27. |
| Sunday May 4, 2025 | Singh asks Warren and McGuire for a meeting to discuss documents Warren shared on May 1. | Gov't Evid. Hr'g Ex. 1 at 12. |
| Monday May 5, 2025 | Homeland Security Investigations – Houston ("HSI-Houston") interviews another cooperating witness ("CC-2") in Texas. CC-2 corroborates Hernandez-Reyes' testimony regarding Abrego's human smuggling activities. | Def. Revocation Hr'g Ex. 6. |
| Wednesday May 7, 2025 | McGuire, then-Criminal Division Chief for the U.S. Attorney's Office for the Middle District of Tennessee Ben Schrader, and others interview Hernandez-Reyes for the fourth time at the U.S. | Hernandez-Reyes, No. 4:23-cr-00321 (S.D. Tex. filed May 16, 2025) |

9

| Date | Event | Citation |
|---|---|---|
| | Attorney's Office in Nashville before he testifies before the grand jury in the Middle District of Tennessee. | (Doc. No. 26); Evid. Hr'g Tr. at 176; Def. Revocation Hr'g Ex. 4. |
| Thursday May 15, 2025 | McGuire circulates a prosecution memo and draft indictment to his leadership team in the U.S. Attorney's Office for the Middle District of Tennessee.<br><br>Schrader later writes: "I have attached to this email a memorandum recommending against charging" Abrego. "Please pass it along to relevant parties in D.C. as well." | Evid. Hr'g Tr. at 167; Gov't Evid. Hr'g Ex. 1 at 60–61. |
| | Members of JTFV, HSI-Nashville, and HSI-Houston interview Hernandez-Reyes for the fifth time at the U.S. Attorney's Office in Houston about human smuggling by Abrego, himself, and others. | Def. Revocation Hr'g Ex. 5. |
| | Members of JTFV, HSI-Nashville, and HSI-Houston interview CC-2 for the second time at the U.S. Attorney's Office in Houston about human smuggling by Abrego, himself, and others. | Def. Revocation Hr'g Ex. 7. |
| Saturday May 17, 2025 | Warren emails Singh an update, copying McGuire.<br><br>Warren writes:<br><br>"Hope you're having a good weekend. Wanted to give you a couple updates. Bottom line is we had a productive week with some significant developments in this investigation. Grand jury testimony went well down in Beaumont and the sources we met with in Maryland and Houston had solid information, including related to MS13.<br><br>We're working over the weekend to finalize an indictment that we will send to you tomorrow night or first thing Monday.<br><br>We're also putting two more witnesses in the grand jury on Wednesday in Nashville | Gov't Evid. Hr'g Ex. 1 at 18–19. |

10

| Date | Event | Citation |
|---|---|---|
| | (for a total of four witnesses in grand jury in the past three weeks).<br><br>Per our prior conversations on timelines, we are on track to present an indictment this Wednesday, May 21, in Nashville. If anything on that front has changed, please let us know soonest.<br><br>Assuming this will be unsealed. Please let us know if not. To that end, it would be prudent to loop in the press office ASAP for their situational awareness that we plan to present this on Wednesday.<br><br>Please let us know what time works Monday for a call. Rob/Chris/me will of course make ourselves available." | |
| Sunday May 18, 2025 | Singh responds: "Let's talk Monday at 2 or 2:30pm EST. Let's keep close hold until we get clearance." | Gov't Evid. Hr'g Ex. 1 at 18. |
| Tuesday May 20, 2025 | Singh emails McGuire, Warren, and Christopher Eason (the other co-Director of JTFV): "Just checking in to see how we're looking on a draft memo. Know you're swamped, sorry to keep bugging, thanks gents."<br><br>Eason responds: "Kick it to you before 4:15."<br><br>Singh responds: "Thanks guys much appreciated." | Gov't Evid. Hr'g Ex. 1 at 23. |
| Wednesday May 21, 2025 | Abrego is indicted in the Middle District of Tennessee. | Doc. No. 3; Evid. Hr'g Tr. at 167. |
| | Schrader resigns from the U.S. Attorney's Office for the Middle District of Tennessee, effective immediately. | Evid. Hr'g Tr. at 167. |
| Friday June 6, 2025 | Abrego arrives in the Middle District of Tennessee from El Salvador. | Evid. Hr'g Tr. at 179. |
| Friday June 6, 2025 | Blanche "reveal[s] that the government started 'investigating' Abrego after 'a judge in Maryland . . . questioned that decision."[6] | See infra note 6; Doc. No. 138 at 6. |

---

[6] Kilmar Abrego Garcia was indicted on 'very serious' charges, US deputy attorney general says, Fox News (June 6, 2025), https://www.foxnews.com/video/6373969491112 [https://perma.cc/S58L-75EY].

11

| Date | Event | Citation |
|------|-------|----------|
| Wednesday July 16, 2025 | Peter Joseph testifies that it "would be atypical" for Hernandez-Reyes "who's in the country illegally, who's been deported multiple times, who's serving a sentence for illegal reentry" to be "released to a halfway house toward the end of their federal sentence, as opposed to being sent to ICE custody and deported." | Revocation Hr'g Tr. at 55. |

## II.    CONCLUSIONS OF LAW

With the record developed, the Court first revisits the presumption of vindictiveness. (Doc. No. 138 at 9). The Court does so for two reasons. First, the full evidentiary record may now establish actual vindictiveness. Second, if it does not, the Court must consider the full evidentiary record to determine if the Government has carried its burden of rebutting the presumption of vindictiveness. In short, the timing of Agent VanWie's decision to reopen the closed HSI investigation of the November 2022 traffic stop and Blanche's now unrebutted public statements tying the reopened investigation to Abrego's successful lawsuit taints the investigation with a vindictive motive. That vindictive taint continued with Singh's close substantive oversight of McGuire's and his prosecution team's work leading to the indictment. Finally, after the indictment was presented, the Executive Branch found a way to return Abrego to the United States to comply with the District of Maryland's order to facilitate his return. While the Court finds insufficient evidence of actual vindictiveness, the Court concludes that the Government has failed to rebut the presumption of vindictiveness. The evidence it labels as newly discovered was available to be obtained with due diligence long before April 2025. Even more, it does not explain the Government's change in position to remove Abrego and not prosecute him to then prosecute and not remove him. McGuire's subjective explanations also do not cure the retaliatory taint that set

12

the investigation and resulting indictment in motion. Because the presumption of vindictiveness remains unrebutted, the indictment must be dismissed.

### A.     The Evidence of Vindictiveness

A criminal defendant may challenge an indictment on two theories: presumptive or actual vindictiveness. United States v. Zakhari, 85 F.4th 367, 379 (6th Cir. 2023). Presumptive vindictiveness "recognizes a rebuttable presumption of vindictiveness if the defendant shows a 'realistic likelihood' that a charge was vindictive." Id. (quoting United States v. Goodwin, 457 U.S. 368, 384 (1982)). Actual vindictiveness, on the other hand, requires "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." United States v. LaDeau, 734 F.3d 561, 566 (6th Cir. 2013) (quoting United States v. Dupree, 323 F.3d 480, 489 (6th Cir. 2003)). As the Sixth Circuit has observed, actual vindictiveness is a "truly rare situation" requiring direct evidence of retaliatory motive, such as when "the prosecutor openly admitted that he acted vindictively." Andrews, 633 F.2d at 456–57 (citing Bordenkircher v. Hayes, 434 U.S. 357 (1978)).

Whether presumptive or actual, the standard of causation is whether the conduct "would not have been initiated but for vindictiveness." Bragan v. Poindexter, 249 F.3d 476, 481 (6th Cir. 2001) (citing Adams, 870 F.2d at 1145). That standard aligns with the consensus in other circuits. See, e.g., United States v. Carey, 816 F. Supp. 3d 129, 141–42 (D.D.C. 2026) (collecting vindictive prosecution cases from the Second, Fourth, Sixth, Seventh, and Tenth Circuits). The but-for standard reflects the reality that defendants who are vindictively prosecuted have often committed the relevant offense, "so it is hard to see how the defendant could ever show that exercising his rights was the sole reason he was charged." Id. at 142 (citing Blackledge v. Perry, 417 U.S. 21, 23, 27–29 (1974)). Thus, a claim of vindictive prosecution "is a matter that is independent of a defendant's guilt or innocence." Cf. United States v. Abboud, 438 F.3d 554, 579 (6th Cir. 2006)

13

(finding that the defense of selective prosecution "relates not to the guilt or innocence of [defendants], but rather addresses itself to a constitutional defect in the institution of the prosecution" (quoting United States v. Berrigan, 482 F.2d 171, 175 (3d Cir.1973))).

The objective evidence here comes close to establishing that but for Abrego's lawsuit, the Government would not have indicted him. The reopening of the investigation, Blanche's unrebutted statements, and Singh's sustained oversight together support that inference. Blanche's statements tie Main Justice to the tainted investigation and confirm what motivated it. Singh's involvement ties Main Justice to the indictment. Yet it is not direct evidence of vindictiveness sufficient to establish actual vindictiveness as required by Andrews. The presumption of vindictiveness nevertheless arose from the same evidence, remains in place, and has not been rebutted by the Government.

### 1. HSI's Reopened Investigation

The timing of HSI's closing and subsequent reopening of the investigation into Abrego's November 2022 traffic stop is telling and forceful. HSI-Baltimore opened the initial investigation into Abrego shortly after the November 2022 traffic stop on December 22, 2022. (Def. Evid. Hr'g Ex. 30 at 5). More than two years later, Agent VanWie closed the case on April 1, 2025, after the Executive Branch removed Abrego to El Salvador, stating that the Government had "accomplished all goals for this case." (Doc. No. 153). Then, on April 10, the Supreme Court upheld the District of Maryland's order requiring the Executive Branch to "facilitate" Abrego's return. Abrego Garcia, 145 S. Ct. at 1018. The next day, after clarifying its order on remand, the District of Maryland found that the Executive Branch had "made no meaningful effort to comply." Abrego Garcia, No. 8:25-cv-00951 (D. Md. filed Apr. 11, 2025) (Doc. No. 61 at 1). It also required the Government to file a daily status report each day thereafter updating the court on the Executive Branch's efforts to return Abrego.

14

Less than a week later, on April 17, Agent VanWie reopened HSI-Baltimore's investigation into Abrego. (Def. Evid. Hr'g Ex. 30 at 5).[7] The Government did not call Agent VanWie to explain why. That is curious because the Government identified him as a person with knowledge of the "decision to reopen the investigation into [Abrego's] human smuggling activities" (Doc. No. 196 at 1)—the decision that the Court had identified as central to Abrego's motion. (Doc. No. 185 at 3). The Government instead offered McGuire's secondhand testimony. To his knowledge, "HSI-Baltimore was getting a lot of requests for information to look into" Abrego, and Agent VanWie "needed to reopen the case to basically get his agents to be able to do that." (Evid. Hr'g Tr. at 114–16). No other witness testified about the reopening of HSI-Baltimore's investigation.

The reopening was followed by a public-facing campaign, with the Executive Branch's fingerprints, tying Abrego to the November 2022 traffic stop. The day after, DHS issued a press release on the November 2022 traffic stop with a picture of Abrego during that traffic stop, which it labeled a "suspected human trafficking incident." See supra note 3. The picture of Abrego was taken directly from the THP's body camera video during the traffic stop. (Compare id. (displaying picture of Abrego during the traffic stop), with Gov't Revocation Hr'g Ex. 1 at (1:14) (body camera

---

[7] The Court has considered the testimony of Agent Saoud, which does little to advance the Government's burden to rebut the presumption of vindictiveness. In fact, her testimony creates more questions than answers. A few examples show as much. Agent Saoud says the November 2022 traffic stop did not come to her in the normal course, but she never explains why. (Evid. Hr'g Tr. at 13, 26). While she acknowledges the national attention on Abrego and the Executive Branch on April 21, 2025, when she learned of the November 2022 traffic stop, she chooses to ignore that the reason for that national attention was at least, in part, that the Executive Branch had not complied with Judge Xinis' April 10, 2025 order to facilitate Abrego's return as soon as possible. (Id. at 17). Agent Saoud claims ignorance of HSI-Baltimore's ongoing investigation and then erroneously limits it to MS-13, further damaging her credibility. (Id. at 19, 28, 30). Finally, she offers no explanation for opening a separate case on Abrego on May 2, 2025, when HSI-Baltimore's case and investigation were significantly more developed.

15

video of Abrego in the same position depicted in the DHS image)). Three days later, the *Tennessee Star* published an article reproducing that same image and detailing the traffic stop. See supra note 4. The body camera video had existed since the November 2022 traffic stop, but it became public knowledge only after the Supreme Court's decision.

With the investigation reopened, the Government quickly secured the evidence it needed to indict Abrego. Before McGuire became involved, HSI-Birmingham—at HSI-Baltimore's request—had identified, located, and interviewed Hernandez-Reyes twice: once on April 22, and again on April 24 under a proffer agreement authorized by the U.S. Attorney for the Southern District of Texas. (Def. Revocation Hr'g Ex. 1; Def. Revocation Hr'g Ex. 2). During the April 22 interview, Hernandez-Reyes revealed that he knew Abrego and told agents "to get him a lawyer and some paper and he would help."[8] (Def. Revocation Hr'g Ex. 1 at 2). During the April 24 proffer interview, Hernandez-Reyes explained that Abrego asked to work for him and that he hired Abrego to transport illegal aliens into the United States. (Def. Revocation Hr'g Ex. 2 at 3). He then disclosed detailed information about Abrego's alleged human smuggling activities in November 2022 and as early as 2016. (Id. at 3–4). According to Hernandez-Reyes, Abrego would transport six to eight illegal aliens each trip, and he transported approximately 600 aliens a year. (Id. at 4). Hernandez-Reyes further disclosed that he paid Abrego $1,300, $1,500, or $1,700 per trip, or $90,000 to $96,000 a year, and that passengers paid $350 to $1,000 each per trip. (Id.).

That cooperation yielded benefits for Hernandez-Reyes. Though his current status is unclear, the evidence shows that he was released to a halfway house at some point following his cooperation. Agent Peter Joseph confirmed that placement at the revocation hearing when he

---

[8] Hernandez-Reyes confirmed that the "paper" he sought was some form of governmental benefit or protection for himself and his family in exchange for his cooperation. Def. Revocation Hr'g Ex. 2.

16

testified that it "would be atypical" for someone in Hernandez-Reyes' position—"in the country illegally," "deported multiple times," and "serving a sentence for illegal reentry"—to be released to a halfway house "as opposed to being sent to ICE custody and deported." (Revocation Hr'g Tr. at 55).

Hernandez-Reyes' knowledge of Abrego's activities was not newly discovered or previously unavailable. Nothing prevented the Government from recovering it earlier through due diligence, and nothing suggests they lacked the means to do so. The Government chose to pursue that evidence only after Abrego's successful lawsuit and the ongoing requirement to report daily to Judge Xinis on efforts to return Abrego to the United States. This supports the inference that the Government would not have reopened the investigation or secured testimony from Hernandez-Reyes but for Abrego's successful lawsuit. Bragan, 249 F.3d at 481 (citing Adams, 870 F.2d at 1145); see also Carey, 816 F. Supp. 3d at 141–42. While the evidence falls short of actual vindictiveness, the presumption remains, requiring the Government to rebut it.

### 2. Blanche's Unrebutted Statements

Blanche did not testify at the February 26 evidentiary hearing. His public statements stand unrebutted. Blanche stated that the Executive Branch began "investigating" Abrego after a judge in Maryland "questioned" the Executive Branch's decision to deport him. See supra note 6. The Court previously found that Blanche's "remarkable statements could directly establish that the motivations for Abrego's criminal charges stem from his exercise of his constitutional and statutory rights," and that Blanche "directly tie[d] HSI's investigation to Abrego's Maryland suit." (Doc. No. 138 at 7–8, 10).

Blanche's words directly confirm that the Executive Branch reopened the criminal investigation because the Judicial Branch required the Executive Branch to facilitate Abrego's return from El Salvador. That evidence confirms what the timing of Agent VanWie's reopening

17

suggests. From the time Agent VanWie reopened the case, the investigation was marked by retaliatory taint. The evidence recovered from that tainted investigation was, in McGuire's words, "significant" and "important corroboration" to support the charges against Abrego. (Evid. Hr'g Tr. at 65–66).

Blanche's statements address the investigation directly, not the indictment. The evidence that ties the tainted investigation to the indictment comes from Singh's ongoing close involvement to the indictment. As a direct report to Blanche, Singh ties the indictment to Blanche's vindictive motive. This further suggests direct evidence of vindictive prosecution.

### 3. Singh's Involvement

Singh did not testify at the February 26 evidentiary hearing. His words nevertheless tell the story of Main Justice's involvement in the prosecution. The objective credible evidence shows that Main Justice was involved in the investigation before McGuire. On the evening of Sunday, April 27, 2025—the same day Agent Saoud first contacted McGuire about the November 2022 traffic stop—Singh emailed McGuire and two other U.S. Attorneys requesting time to discuss Hernandez-Reyes the next morning. (Gov't Evid. Hr'g Ex. 1 at 3; Evid. Hr'g Tr. at 55–56). That was the first time McGuire had heard of Hernandez-Reyes. Yet HSI-Birmingham, in support of HSI-Baltimore's investigation, had already interviewed Hernandez-Reyes twice by then, and the proffer agreement with the Southern District of Texas was in place. (Def. Revocation Hr'g Ex. 1; Def. Revocation Hr'g Ex. 2). Singh knew about the Government's star witness before McGuire and was reaching out to fold him into an investigation that was well under way.[9]

Singh's pre-McGuire activity continued the next morning. At 12:53 a.m. on April 28,

---

[9] The obvious is not lost on the Court. When Singh contacted McGuire, it was not as a peer, but as McGuire's supervisor in ODAG. When Singh informed McGuire about the evidence developed against Abrego, it was clear what Singh and Blanche wanted McGuire to do.

18

before the telephone conference with McGuire and the other U.S. Attorneys later that day, Singh received the THP report on the November 2022 traffic stop directly from HSI Acting Assistant Director for Domestic Operations William Walker. (Gov't Evid. Hr'g Ex. 1 at 2927). Walker did not send a copy to McGuire or anyone else on his email. (Id.).

Once Singh brought McGuire into the fold, his contact with McGuire was close, regular, and substantive. On April 30, when McGuire reported that he expected to have a charging document the following week, Singh told him to "[k]eep me posted." (Id. at 3). Later that same day, McGuire informed Singh that the Tennessee Department of Safety would release a redacted video of the November 2022 traffic stop. Singh wanted more information and asked detailed questions about why and how the release would proceed. (Id. at 7–9). Singh then pressed McGuire for more information: "How close do we think we are to charging? And can we set up a brief call before charges get filed?" (Id. at 8). He asked McGuire if he had a "sense of potential charges," directed him to "sketch out a draft complaint . . . by 5pm tomorrow," and told McGuire and Warren that this case was "top priority for us," which McGuire understood to mean Main Justice leadership. (Id. at 8–9; Evid. Hr'g Tr. at 135). McGuire sent a draft complaint affidavit to Singh the next day. (Gov't Evid. Hr'g Ex. 1 at 10). Warren also sent Singh open-source documents for review. (Id. at 12). Three days later, on May 4, Singh requested a telephone conference to discuss the documents Warren had pulled. (Id.).

On May 17, Warren updated Singh on the prosecution team's progress, copying McGuire and Eason in the email. (Id. at 18–19). He reported that the grand jury testimony was going well and that they were finalizing an indictment to send Singh the next day. (Id.). He confirmed that they were "on track to present an indictment this Wednesday, May 21, in Nashville," and asked Singh to let them know "soonest" "[i]f anything on that front has changed." (Id.). He further

19

indicated that they were "[a]ssuming this will be unsealed" and asked Singh to "let us know if not." (Id.). He also asked Singh to "let us know what time works Monday for a call." (Id.). The next day, Singh instructed them to "keep close hold until we get clearance." (Id. at 18).

The plain reading of that exchange is that Warren sought guidance from Blanche and Singh on several issues. Specifically, he wanted confirmation on the timing of the indictment, whether the indictment would be sealed or not, and the time for a call with Singh. (Id. at 18–19). McGuire testified that he did not know what Singh "meant by 'until we get clearance,'" because, in his view, he "was going to be the one to decide" to take the indictment to "the grand jury." (Evid. Hr'g Tr. at 155–56). The Government tries to limit further the reference to "get clearance" to the sealing of the indictment. (See Doc. No. 307 (arguing that "McGuire looked to ODAG for 'clearance' only about 'sealing the indictment'")). The Court rejects that narrow, self-serving interpretation of Singh's instruction to await "clearance" because Singh's words were plain and unambiguous. Whatever McGuire thought about his own authority, Singh's instruction to await "clearance" is evidence that Main Justice exercised control over the charging decision down to the finish line. Indeed, Singh did so to the end. On May 20, Singh asked McGuire and Warren for "a draft memo." (Gov't Evid. Hr'g Ex. 1 at 23). Only three days later, the Government indicted Abrego. (Doc. No. 3).

Singh thoroughly engaged himself in the preindictment process. His oversight touched on everything from the timing of the indictment to the substance of the potential charges. His sustained oversight is objective evidence that connects Main Justice to the indictment. Notwithstanding McGuire's purported belief that he was the sole decisionmaker, this Court cannot ignore the chain of command that McGuire reported to: Singh, Blanche, and then Bondi. Blanche's statements directly tie Main Justice to the reopening of the investigation in response to Abrego's

successful lawsuit. Together with Singh's oversight of the indictment process, the credible objective evidence shows that, "but for" Abrego's successful lawsuit, the Government "would not have" indicted Abrego. Bragan, 249 F.3d at 481 (citing Adams, 870 F.2d at 1145); see also Carey, 816 F. Supp. 3d at 141–42.

### B. The Government's Nonretaliatory Explanations Fall Short

The Government must rebut the presumption of vindictiveness, or "the presumption stands and the court must find that the prosecutor acted vindictively." Bragan, 249 F.3d at 482. To carry that burden, the Government must come forward with "objective, on-the-record explanations"— for example, "governmental discovery of previously unknown evidence" or "previous legal impossibility"—establishing that this prosecution was brought for legitimate, nonvindictive reasons. Zakhari, 85 F.4th at 379 (quoting LaDeau, 734 F.3d at 566); see also United States v. Mincy, No. 24-4019, 2025 WL 3269350, at *4 (6th Cir. Nov. 24, 2025) (Readler, J., concurring) (listing "newly discovered evidence" as "an alternative, nonretaliatory explanation"). Subjective assertions by individual prosecutors or other officials about their own motives will not do, because "judges should [not] pass on subjective good faith assertions by prosecutors." Andrews, 633 F.2d at 456; see also LaDeau, 734 F.3d at 572. To the extent a prosecutor's explanations are credible, however, they deserve consideration. Andrews, 633 F.2d at 456.

The Government offers two explanations to rebut the presumption. It argues that the investigation produced "new evidence," (Doc. No. 307 at 8–12, 22), and that McGuire alone made the charging decision, free of any influence. (Id. at 13–23). Abrego responds that neither explanation engages the evidence identified as the source of the vindictiveness and both explanations are insufficient as a matter of law. (Doc. No. 306 at 11–25).

21

### 1. The "Newly Discovered" Evidence Explanation Fails

The Government's primary explanation is that the reopened investigation produced new evidence sufficient to rebut the presumption. (Id. at 8–12, 22). That theory has two components. The first is that McGuire uncovered evidence never seen before late April 2025. (Id. at 8–10). The second is that the evidence was literally new in the sense that the witness testimony, phone records, license plate data, and corroboration that McGuire developed had not been uncovered before. (Id. at 10–12). Both rest on a misunderstanding of what new evidence means in this context.

Neither party defines what sort of new evidence is sufficient to rebut a presumption of vindictiveness. The Sixth Circuit's vindictive prosecution decisions do not directly address that question. Those decisions, however, suggest that new evidence sufficient to rebut the presumption shares two characteristics.

First, the evidence must have been unavailable to the Government and not subject to discovery with due diligence. The law governing newly discovered evidence under Federal Rule of Criminal Procedure 33(b)(1) confirms that requirement. See, e.g., United States v. Iossifov, 45 F.4th 899, 920 (6th Cir. 2022) (finding that evidence "is newly discovered" only if it "could not have been discovered earlier with due diligence").

Second, the discovered evidence must justify the Government's change in position. In United States v. Howell, for example, the defendant was originally indicted on four counts arising from two armed bank robberies. 17 F.4th 673, 680 (6th Cir. 2021). Later, a ballistics report was completed that matched a firearm found in defendant's possession at the time of his arrest to a spent shell casing recovered from one of the robberies. Id. at 689. The prosecution then filed a superseding indictment adding a count of felon in possession of a firearm. Id. The defendant argued that the additional charge was vindictive because it caused the jury to learn he was a

22

convicted felon, and it was added sixteen months after the filing of the initial indictment. Id. at 686. The Sixth Circuit rejected that argument. Id. at 689. The ballistics report "was new and important evidence" because it was unavailable to the prosecution before it added the charge, and once completed, it justified the new charge. Id.

Likewise, in United States v. Suarez, the defendant was originally indicted on a single bribery count tied to alleged corrupt dealings. 263 F.3d 468, 473 (6th Cir. 2001). While that charge was pending, the prosecution, exercising due diligence, continued investigating and uncovered new criminal conduct. Id. at 473–74. The prosecution then filed a superseding indictment adding new charges. Id. at 474–75. The defendant argued that the new charges were vindictive. Id. at 475. The Sixth Circuit rejected that argument because the additional evidence was "unavailable at the time of the first indictment" and it justified the prosecution's decision to add new charges. Id. at 480.

Those decisions confirm that new evidence sufficient to rebut the presumption must have been unavailable to the Government and not subject to discovery through due diligence, and its discovery must justify the Government's change in position. In Howell and Suarez, the development of new, previously unavailable evidence in the context of ongoing criminal prosecutions objectively justified the government's decision to seek additional charges. Howell, 17 F.4th at 689; Suarez, 263 F.3d at 480. Here, the Government changed its position from remove and not prosecute to prosecute and not remove only after Abrego's successful lawsuit. Then it decided to reopen the investigation of Abrego to develop the evidence to justify the change in position. McGuire decided to indict Abrego based on evidence developed during the reopened tainted investigation. Thus, whether the evidence uncovered was new to McGuire or literally new, neither explanation rebuts the retaliatory taint that set the investigation, indictment, and Abrego's

23

return in motion. The Court will nevertheless address both explanations.

The Government first argues that "[p]rior to April 2025, neither HSI-Nashville nor USAO-MDTN were aware of the November 2022 traffic stop involving Defendant," and that "Mr. McGuire was never alerted about Defendant's traffic stop in November 2022 until Agent Saoud's call on April 27, 2025." (Doc. No. 307 at 9). After receiving that call, "[n]ew evidence formed the basis for Mr. McGuire's decision to investigate and later indict" Abrego. (Id.). McGuire reviewed the body camera video, learned that Hernandez-Reyes had come forward, and concluded that the stop appeared consistent with human smuggling. (Id. at 9–10).

The evidence was new to McGuire, but with due diligence it could have been discovered in 2022. The body camera video and the THP report had existed since November 2022 and were already public knowledge by the time McGuire reviewed them. DHS had published an image from the body camera video on April 18, 2025, and the *Tennessee Star* had run an article on the stop on April 21, 2025. That evidence does not justify the Government's decision to reopen the closed investigation. It was always available. Critically, that evidence does not explain the Government's decision to first remove Abrego to El Salvador and not prosecute him and then do just the opposite.

Hernandez-Reyes' testimony was the direct product of the tainted investigation. McGuire did not discover him. Singh delivered him. Within hours after Agent Saoud contacted McGuire, Singh emailed McGuire requesting a telephone conference the next morning regarding Hernandez-Reyes. (Evid. Hr'g Tr. at 55–56; Gov't Evid. Hr'g Ex. 1 at 3). By that point, HSI had identified, located, and twice interviewed Hernandez-Reyes, including once under a proffer agreement authorized by the Southern District of Texas. (Def. Revocation Hr'g Ex. 1; Def. Revocation Hr'g Ex. 2). McGuire himself acknowledged that he inherited Hernandez-Reyes. When asked at the

24

evidentiary hearing whether he had any knowledge of Hernandez-Reyes' statements that HSI-Baltimore had developed, McGuire testified: "Well, I – I didn't. I mean, those witness statements came forward three or four days before I got involved. I mean, they were very late – they were almost right as I took the case over – in terms of that I learned that that had just happened." (Evid. Hr'g Tr. at 64).

With Hernandez-Reyes' testimony in hand, McGuire then committed to prosecution almost immediately. He began drafting a charging document two days after Agent Saoud's call and Singh's email. He did so before HSI-Nashville had even formally opened its own investigation. (Id. at 27, 82–83). Whatever evidence McGuire's team developed after that point could only support the already made decision to indict Abrego. McGuire's actions make sense. After all, Singh—to whom McGuire reported—provided him Hernandez-Reyes' testimony implicating Abrego. Indeed, what else was McGuire to do?

The Government next argues that McGuire's investigation uncovered evidence that had not been generated, collected, or elicited until McGuire's team developed it after April 27, 2025. (Doc. No. 307 at 10–12). In the Government's eyes, McGuire obtained additional license plate reader data, cell phone records, phone data from Hernandez-Reyes, additional witnesses, and reinterviewed witnesses that yielded new information. (Id.). That is a half-truth. The body camera video and Hernandez-Reyes' testimony were not the product of McGuire's work. One had been within the Government's reach long before the April 17, 2025 reopening, and the other was developed through the reopened tainted investigation before McGuire was contacted. Hernandez-Reyes' phone data was also obtained through that same tainted investigation. (Def. Revocation Hr'g Ex. 3). HSI-Baltimore obtained Hernandez-Reyes' consent to search his phone two days after McGuire learned of the case. (Id.). McGuire did not generate that evidence. At best, he was

25

the recipient of evidence from the tainted investigation and used it to support the decision to indict Abrego.

The rest of the evidence the Government identifies was developed after McGuire had already committed to prosecution. The license plate reader data, the additional witnesses and cooperators, and the reinterviews all came after McGuire began drafting a charging document on April 29, 2025. (Evid. Hr'g Tr. at 82–83). None of it explains the change in position from remove and not prosecute to prosecute and not remove. Nor did that evidence appear to materially add to what the Government had already developed through the reopened, tainted investigation. CC-2 corroborated Hernandez-Reyes' account but added little else. (Def. Revocation Hr'g Ex. 6). The reinterviews of Hernandez-Reyes and CC-2 basically covered the same ground as the earlier interviews. (Id. Ex. 4; id. Ex. 5; id. Ex. 7).

In sum, the Government's explanation gets the sequence backwards. Instead of investigating the November 2022 traffic stop to identify who was responsible for the human smuggling, Blanche started the investigation to implicate Abrego. He did so to justify the Executive Branch's decision to remove him to El Salvador. The tainted investigation identified the long existing body camera video, the THP report, Hernandez-Reyes, and his phone data. McGuire's decision to prosecute was based on that evidence given to him by his direct supervisors Blanche and Singh. Neither body of evidence rebuts the existing presumption of vindictiveness. Because the evidence that the Government points to confirms the decisions that it already made rather than justifying them, it fails to rebut the presumption that those decisions were vindictive. Howell, 17 F.4th at 689; Suarez, 263 F.3d at 480.

### 2. The Independent Prosecutor Explanation Fails

The Government argues that McGuire's explanations for prosecuting Abrego deserve consideration. (Doc. No. 307 at 13). The Court agrees and has considered his explanations—to

26

the extent they are credible—in light of the totality of evidence before the Court. Andrews, 633 F.2d at 456. The focus of the inquiry is on objective, not subjective explanations. LaDeau, 734 F.3d at 572. The Court heeds the Sixth Circuit's warning that courts should not "pass on subjective good faith assertions by prosecutors." Andrews, 633 F.2d at 456. In LaDeau, the Government relied on an affidavit from the assistant U.S. attorney to explain the timing of a superseding indictment. LaDeau, 734 F.3d at 565. The assistant stated he had "intended all along" to bring the superseding charge but had not done so until after the defendant prevailed on a suppression motion. Further, the assistant asserted that no member of the United States Attorney's office "would seek to retaliate against a defendant" for filing such a motion. Id. The Sixth Circuit held that "the subjective rationales offered by the government" were not "sufficiently 'objective' explanations" to rebut the presumption of vindictiveness. Id. at 572. The court declined to undertake "the 'difficult and unpleasant decision-making' that would be demanded of a court assessing a prosecutor's subjective good faith assertions." Id. (quoting Andrews, 633 F.2d at 456).

The same is true here. The Government contends that McGuire alone made the decision to indict Abrego free of influence, pressure, or direction from Blanche, Main Justice, the White House, or DHS. (Doc. No. 307 at 13–23; Evid. Hr'g Tr. at 46–47, 171–72). This Court finds that the persuasive, credible, objective evidence shows otherwise. McGuire was not objectively independent in any sense that rebuts the presumption. As explained, his superiors Blanche and Singh presented the evidence to him to charge Abrego on April 27, such that McGuire could begin to draft charges on April 29. Singh clearly supervised McGuire until the indictment was returned. Then Main Justice returned Abrego to the United States. McGuire's subjective good faith explanations are at odds with all the other evidence before the Court. His explanations are also at

27

odds with the concern of his own Criminal Division Chief, who warned that the prosecution could appear vindictive.

The Government's independence argument rests on Bragan. (Doc. No. 307 at 23 (citing Bragan, 249 F.3d at 484)). That decision illustrates the kind of prosecutorial independence that rebuts the presumption. The original prosecutors in that case committed misconduct in obtaining a conviction at trial. Bragan, 249 F.3d at 478. The conviction was vacated. Id. at 478–79. A new prosecutor was appointed who had no role in the prior proceedings. He also "did not discuss" the case with the original prosecutors, and he conducted an "independent investigation," reviewed the evidence, and decided to reinstate the charges. Id. at 480, 484. Notably, the new prosecutor's "review of the evidence did not disclose any evidence that would not have been available to" the original prosecutor. Id. at 480. The Sixth Circuit held that the presumption of vindictiveness was rebutted because the new prosecutor had "total autonomy" and the conviction was secured on grounds untainted by the prior misconduct. Id. at 484–85.

McGuire's involvement bears no resemblance to Bragan. McGuire neither redid the case from beginning to end, nor operated independently of the tainted actors. Instead, he inherited the reopened, tainted investigation and carried it through to completion. His star witness was delivered to him by Singh. (Gov't Evid. Hr'g Ex. 1 at 3; Evid. Hr'g Tr. at 55–56). He began drafting a charging document two days later before HSI-Nashville opened its own investigation. (Evid. Hr'g Tr. at 82–83; id. at 27). Singh's oversight of McGuire and his team continued until the indictment was returned.

The objective evidence further undermines McGuire's stated independence. McGuire's own testimony ties Main Justice to Abrego's return to the United States and the timing of the indictment. When the Court asked whether the Supreme Court had ordered Abrego's return by

28

the time McGuire was making charging decisions, McGuire answered: "Oh, there's no question. . . . And that was in the backdrop of this. But he was not back yet. And so I didn't know how that was going to shake out, and I wasn't going to be involved in that part of it. . . . So I didn't want the [Speedy Trial Act] clock to start running until we kind of knew where we were headed with all of that." (Evid. Hr'g Tr. at 86). McGuire's own words establish his dependence on Main Justice. Abrego's return was outside his control. He was timing the indictment around steps Main Justice was taking to return Abrego from El Salvador. While all of this was ongoing, Judge Xinis waited for the Executive Branch to comply with her April 10, 2025 order to return Abrego to the United States.

McGuire's testimony was choppy. He expressed uncertainty about what Singh meant when he instructed him to "keep close hold until we get clearance"—an instruction McGuire also conceded generally means "get approval." (Id. at 155–56). In his October 22, 2025 affidavit, McGuire represented that he had "no correspondence (email, text, call, letter, etc.)" with the Office of the Attorney General or Blanche about the prosecution. (Doc. No. 178-1 at 1). On cross-examination, he acknowledged that Blanche had called him in May 2025 to congratulate him on Abrego's return to the United States. (Evid. Hr'g Tr. at 179). The Government's characterization of McGuire's communications with Main Justice as a "one-way street" loses credibility when McGuire himself acknowledged dependence on Main Justice for Abrego's return, direction from Singh, congratulatory contact from Blanche, and uncertainty about what was being asked of him. These contradictions undermine how much consideration McGuire's testimony deserves. Andrews, 633 F.2d at 456.

McGuire's testimony also does not explain the objective evidence of pressure from DOJ. He knew that DOJ attorneys had been warned that delaying or impeding the Department's mission

could result in discipline or termination. (Id. at 97–102; Def. Evid. Hr'g Ex. 66). He knew that DOJ attorneys, including U.S. Attorneys, had been removed from office for perceived disloyalty to the Executive Branch. (Evid. Hr'g Tr. at 97–102; Def. Evid. Hr'g Ex. 66). McGuire offered no objective explanation for how he insulated the charging decision from that pressure.

Even setting McGuire's purported independence aside, McGuire's subjective good faith explanations about his own motives cannot rebut the presumption. LaDeau, 734 F.3d at 572; Andrews, 633 F.2d at 456. McGuire testified that his sole consideration in deciding to seek an indictment was whether he first believed that the person committed a crime and that he could prove that to a jury beyond a reasonable doubt. (Evid. Hr'g Tr. at 48). Yet the defendant's guilt is not at issue on a vindictive prosecution motion. See, e.g., Carey, 816 F. Supp. 3d at 142 (citing Blackledge, 417 U.S. at 23, 27–29); Abboud, 438 F.3d at 579. The presumption must be rebutted with objective evidence, Zakhari, 85 F.4th at 379, regardless of whether the defendant actually committed the underlying offense.

McGuire's subjective explanations are also difficult to reconcile with his Criminal Division Chief's recommendation against charging Abrego. (Evid. Hr'g Tr. at 167; Gov't Evid. Hr'g Ex. 1 at 60–61). Schrader prepared a written memorandum to that effect and asked that it be passed along to relevant parties in Washington. (Gov't Evid. Hr'g Ex. 1 at 60–61). McGuire acknowledged that vindictive prosecution had been "in the water" and that Schrader had specifically raised it. (Evid. Hr'g Tr. at 147). McGuire proceeded over Schrader's recommendation anyway. He testified that he focused only on whether Abrego committed a crime that the Government could prove and that "[i]t doesn't matter what the rest of the political landscape looks like." (Id. at 149). Schrader resigned the day of the indictment, effective

immediately. (Id. at 167). The Government does not address what steps McGuire took to alleviate Schrader's concerns of vindictiveness.

The Government's independence theory fails at every level. The objective record establishes McGuire's dependence rather than independence. His subjective rationales dressed up as objective explanations do not rebut the presumption as a matter of law. The Government's silence on Schrader's concerns confirms what it cannot defend. McGuire is a talented, gifted prosecutor brought into a tainted investigation, handed a star witness by Main Justice to obtain a tainted indictment. He was then dependent on Main Justice to return Abrego from El Salvador to answer the charges, even though since April 10, 2025 Judge Xinis had ordered the same. McGuire's stated independence is insufficient to rebut the presumption of vindictiveness.

## III. CONCLUSION

What the Government has chosen not to address is as telling as what it has. The Government's posthearing brief mentions Blanche once, in a parenthetical to McGuire's testimony. (Doc. No. 307 at 13 (citing Evid. Hr'g Tr. at 46–47)). It mentions the Supreme Court's ruling once, in a footnote. (Id. at 18 n.4). It mentions Singh eleven times, framing him as the recipient of McGuire's updates and ignoring his close, continuous, and substantive oversight. (Id. at 16 (insinuating that communications were "a one-way street" from McGuire to Singh)). The Government does not mention Schrader's recommendation against charging Abrego at all. The reopening of the closed HSI investigation is the source of the vindictiveness. Blanche's public statements about the investigation and Singh's involvement tie Main Justice to the reopened investigation and the indictment. After the indictment became reality, the Government ignores McGuire's testimony that Main Justice caused Abrego's return to the United States, as the District of Maryland had long required. The Government's rebuttal to the presumption of vindictiveness

does not engage with that evidence. As a matter of logic, the Government cannot rebut a presumption when it does not address the evidence supporting the presumption.

"[A] prosecutor's exercise of coercive power must be impartial . . . [,] evenhanded . . . [,] [and] applied without favoritism or bias . . . ." Zakhari, 85 F.4th at 385 (Kethledge, J., concurring). Then-Attorney General Robert H. Jackson cautioned that when "the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that [is] the greatest danger of abuse of prosecuting power . . . ." Robert H. Jackson, The Federal Prosecutor, 31 J. Crim. L. & Criminology 3, 5 (1940). The evidence before this Court sadly reflects an abuse of prosecuting power.

The Court does not reach its conclusion lightly. The objective evidence here shows that, absent Abrego's successful lawsuit challenging his removal to El Salvador, the Government would not have brought this prosecution. The Executive Branch closed its investigation on the November 2022 traffic stop. Only after Abrego succeeded in vindicating his rights did the Executive Branch reopen that investigation. What the Government labels as "new evidence" was not new as a matter of law. The prosecutor's subjective good faith does not cure the retaliatory taint. Absent Blanche's tainted investigation, Agent Saoud would not have called McGuire, Singh would not have brought him into the fold, and McGuire would not have sought an indictment against Abrego. The indictment then provided the Executive Branch cover to comply with Judge Xinis' order to facilitate Abrego's return to the United States as soon as possible.

Abrego's motion to dismiss the indictment must be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

32